UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| RACHEL D. ADKISON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 15-171-GFVT |
| | ) | |
| V. | ) | |
| | ) | **OPINION** |
| CAROLYN COLVIN, | ) | **&** |
| Acting Commissioner of Social Security, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

Before the Court is Magistrate Judge Edward B. Atkins's Recommended Disposition. [R. 16.] On June 11, 2015, Plaintiff Rachel D. Adkison sought judicial review of the Commissioner of Social Security's decision that she "had been erroneously paid disability benefits beginning in January 2011, creating an overpayment of benefits in the amount of $23,344.10." [R. 1 at 1.] The Court referred this matter to Judge Atkins for preparation of a recommended disposition, and Judge Atkins submitted that recommendation on August 1, 2016. [R. 16.] For the reasons explained below, the Court will ADOPT IN PART the Magistrate's recommendation, GRANT Adkison's Motion for Summary Judgment and DENY the Commisioner's motion.

**I**

Judge Atkins thoroughly detailed the factual background to this dispute, and the Court now incorporates that narrative by reference. [R. 16 at 1-3.] To summarize, the Social Security Administration ("SSA") found Adkison disabled in August 2008. [R. 12-1 at 2.] Around that same time, she was "elected as a magistrate in Garrard County, Kentucky." [*Id.*] But this new

job did not necessarily prevent her from receiving disability benefits; instead, Adkison entered what is known as a "trial work period" (TWP), which allows a "disabled person to work for nine months and continue receiving disability benefits." [*Id.* at 3.] Adkison's TWP ended in October 2008, after which she entered yet another phase of the disability gauntlet: the "Extended Period of Eligibility" (EPE).[1] [*Id.* at 4.]

During the EPE, a claimant will receive benefits only on those months that she does not engage in "substantial gainful activity" (SGA).[2] [*Id.* at 6.] Most relevant here, work resulting in an income of $1,000 or more per month qualified as SGA at the time. [*Id.* at 7.] So if the claimant earned $1,000 or more in a given month during her EPE, she would not receive benefits for that month. But if she earned less than $1,000 in some other month during this period—even if she had already exceeded the SGA in a previous month—she would still receive benefits for that month.

Adkison continued to receive periodic benefits until April 2012, when the SSA notified her that her EPE had ended. [*Id.* at 4-6.] But this notice not only announced that Adkison would no longer receive benefits; the agency also found that her earnings had consistently exceeded $1,000 per month dating back to January 2011. [*Id.* at 6.] The SSA thus found that "it had overpaid [her] for sixteen months, from January 2011 through April 2012, [resulting in] $23,344.10 in [undue] disability benefits," and demanded that she repay that amount in full. [*Id.* at 7.]

Adkison filed a Request for Reconsideration the following month, which the SSA denied. [R. 12-1 at 7.] She then requested a hearing with Administrative Law Judge (ALJ) Greg Holsclaw. In August 2013, Holsclaw found that "the claimant's earnings, including base pay,

---

[1] The EPE may also be called the "reentitlement period," depending on whom you ask. [R. 12-1 at 5-6.]
[2] This is a somewhat streamlined description of the way the EPE operates. A more detailed description appears later in this order, *infra* at 5.

travel stipend, and voluntary incentive training [were] correctly considered [SGA]." [Tr. 16.] He also concluded that the agency had properly calculated her monthly earnings over the relevant time period. [Tr. 16-18.]

On appeal, Adkison argued, among other things, that federal regulations prohibited the SSA from averaging her monthly income during the latter phase of her EPE. [R. 12-1 at 10.] The Appeals Council agreed that her "earnings should not have been averaged for the months during [her EPE] after [her] disability ceased due to performance of [SGA]," and that the ALJ had erred in calculating her monthly income this way. [Tr. 7.] But the Appeals Council also found that this error was harmless because her monthly income of "$1,017.40" was "uniform throughout the period at issue," and thus her earnings exceeded the $1,000 threshold regardless of whether they were averaged. [*Id.*]

Adkison then sought review from this Court. Her challenge to the ALJ's decision initially rested on two claims: first, that her "mileage stipend" and "voluntary incentive training payment" should not count as income for the purpose of meeting the $1,000 threshold; and second, that the ALJ and the Appeals Council improperly averaged her monthly income in deciding whether she met this threshold. [R. 12-1 at 8-14.] In his Report and Recommendation, Judge Atkins concluded that (1) both the mileage stipend and incentive payment should count as income and (2) the Appeals Council properly calculated her earnings. [R. 16 at 6-10.] Adkison did not object to the Magistrate's finding that the mileage stipend and incentive payment should count as income, and she has waived her right to raise that issue on appeal. *See Neuman v. Rivers*, 125 F.3d 315, 322 (6th Cir. 1997) ("[O]nly those specific objections to the magistrate's report made to the district court will be preserved for appellate review; making some objections but failing to raise others will not preserve all the objections a party may have."). In any case,

3

the Court has carefully reviewed the Magsitrate's reasoning on this point, and agrees that both forms of payment counted as income. The only remaining questions before the Court are (1) whether the SSA improperly averaged Adkison's monthly income and (2) whether this error was harmless.

## II

### A

In reviewing an ALJ's decision, courts must decide whether substantial evidence in the record supports the agency's judgment. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Shelman v. Heckler*, 821 F.2d 316, 319-20 (6th Cir. 1987). To find "substantial evidence," courts must perceive "more than a scintilla of evidence but less than a preponderance," which is to say that a court need only find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*) (internal quotations omitted) (citation omitted).

When searching the record for such evidence, courts must examine the record as a whole. *Cutlip*, 25 F.3d at 286 (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983)). This examination, however, is limited "to the particular points that [the claimant] appears to raise in her brief on appeal." *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006). Courts are not empowered to conduct a *de novo* review, resolve conflicts in evidence, or make credibility determinations. *Ulman v. Comm'r of*

*Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (citations omitted); *see also Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1228 (6th Cir. 1988). Rather, if the Court finds substantial evidence to support the Commissioner's judgment, it must affirm that decision even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion. *Ulman, 693 F.3d at 714*; *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

**B**

This is an odd case. Unfortunately, the record reveals that almost every party to this dispute—including the ALJ, the Appeals Council, the Magistrate, and counsel for the Commissioner—made some version of the same mistake. To locate this error, a brief review of the applicable regulations is in order.

In calculating a claimant's income during her EPE, federal regulations permit the SSA to *begin* by averaging her monthly earnings. 20 C.F.R. § 404.1592a(a)(1). The claimant's disability ceases on the first month that her income, averaged across the relevant work period, qualifies as SGA. She will then receive benefits for that month plus the two succeeding months. 20 C.F.R. § 404.1592a(2)(i). *After* this three-month period, however, the claimant may still re-qualify for benefits on any month that her income falls below the $1,000 threshold. During this period, the SSA is *not* permitted to average her monthly earnings. *Id.*

All parties now concede that, in its initial determination of Adkison's eligibility, the SSA averaged her income even after this three-month period had ended. That was an error, and the ALJ missed it. The Appeals Council did not, and agreed with Adkison that her "earnings should not have been averaged for the months during [her EPE] after [her] disability ceased due to performance of [SGA]." [Tr. 7.] But the Appeals Council went on to state that this was "not a

5

material error" because her monthly income of "$1,017.40" was "uniform throughout the period at issue." [Tr. 7.] That was also an error. The Appeals Council noted that Adkison "received $342.46 every two weeks for salary and $127.11 every two weeks for [her] expense stipend," and then announced that her "regular monthly earnings were thus $1,017.40 per month during that period." [Tr. 7.] Simple arithmetic demonstrates that a person who receives "$342.46 every two weeks for salary and $127.11 every two weeks for [her] expense stipend" will earn $939.14 per month, not $1,017.40. The Appeals Council clearly reached this $1,017.40 figure by—you guessed it—averaging her earnings. Because there are fifty-two weeks in a year, Adkison's income from these two sources totaled $12,208.82 annually; divided by twelve, that equals $1,017.40. But this calculation does not change the fact that Adkison received only $939.14 on most of the months in question.

In his recommended disposition, the Magistrate found that "the Appeals Council's math was assuredly correct." [R. 16 at 10.] It was not. Apparently, the Commissioner did recognize that the Appeals Council's arithmetic was wrong, but then asked the Court to apply an equally flawed calculation. The Commissioner now insists that a heretofore unknown "expense stipend" pushed Adkison's income over the $1,000 threshold, the SSA's mathematical limitations notwithstanding. [R. 19 at 2.] She cites the testimony of James Bushnell, a county payroll executive, that Adkison "also received $275.40 per month [in what] was (1) called an "expense stipend" (or 'expense allowance' or 'expense reimbursement'); and (2) considered compensation and income for serving on fiscal court committees." [Tr. 124-25.]

The problem with this additional $275.40 "expense stipend" is that it does not exist. Adkison's payroll records establish that she did not receive any income beyond her wages, mileage stipend, and incentive pay in 2011. [Tr. 85-94, 104-105, 109-110.] And her 2011 W-2

6

"breaks down to $8,903.96 in wages, $3,678.60 in incentive pay and $3,304.86 in mileage expense payments, which is precisely what her payroll records show she earned." [R. 20 at 2, Tr. 131.] The $275.40 "expense stipend" mentioned in Bushnell's testimony is simply a reference to Adkison's mileage stipend. That may sound surprising, given that she typically received only a bi-weekly payment of $127.11, or $254.22 per month, for her mileage. But if you multiply this bi-weekly payment by twenty-six (to account for the fifty-two weeks in a year) and divide by twelve, you get $275.40. The Commissioner's citation to this phantom "expense stipend," then, packaged two errors into one: first by double-counting Adkison's mileage stipend, and then by averaging the double-counted amount.

But that is not quite the end of the Court's analysis. The Commissioner offers one more argument in support of the ALJ's finding, and this claim requires more careful attention. Although she concedes that federal regulations prohibit averaging in this context, the Commissioner also maintains that averaging Adkison's income was harmless error because "the agency's sub-regulatory policy provides, more specifically, that an incentive payment should be distributed over the period in which it was earned." [R. 19 at 4.] This "sub-regulatory policy" is POMS DI 10505.010(D), which instructs the SSA "to determine if [a claimant's] bonus/incentive payment represents a specific period of time, and if it does, distribute the earnings over the period of time it was earned." But "[i]f the amount does not represent a specific period of work activity, or a specific time period is not determinable," the agency should "distribute the payment(s) monthly over the time period the person had worked for the employer up to but not exceeding a year." *Id.*

In May 2011, Adkison received a lump-sum incentive payment of $3,678.60. [Tr. 86.] This payment served as compensation for her attendance at periodic training events throughout

the year. [Tr. 64-65.] According to the Commissioner, then, POMS DI 10505.010(D) required the agency to distribute that income over every month of 2011. Doing so would easily push Adkison over the $1,000 threshold.

Adkison counters that "distributing" is essentially "averaging" by another name. She directs the Court again to 20 CFR § 404.1592a(a)(2)(i), which states in relevant part:

> In determining whether you do substantial gainful activity in a month for purposes of stopping or starting benefits during the reentitlement period *we will consider only your work in, or earnings for, that month.* Once we have determined that your disability has ceased during the reentitlement period because of the performance of substantial gainful activity . . . *we will not apply the provisions of…§ 404.1574a regarding averaging of earnings*.

(emphasis added). With these regulatory requirements in mind, Adkison claims that "POMS DI 10505.010(D) cannot be applied in [her] case to distribute the incentive pay earnings to any month other than the month she earned it." [R. 20 at 4.] She also notes that the POMS "have no legal effect and do not bind the SSA," and thus they "are not entitled to deference to the extent they contradict a Social Security regulation." [*Id.* at 3.]

To some extent, Adkison's argument simply begs the question. Application of POMS DI 10505.010(D) only "contradict[s] a Social Security regulation" if distribution of an incentive payment violates § 404.1592a(a)(2)(i). This regulation prohibits averaging, not distribution. The ultimate question, then, is whether distribution is so like averaging that doing the former violates a regulation prohibiting the latter. Not surprisingly, no court has ever addressed this question. In fact, the Court can identify no case that even discusses the sub-regulatory policy at issue here. And neither the ALJ nor the Appeals Council ever cited POMS DI 10505.010(D) or otherwise discussed the difference between distribution and averaging.

This Court is not well-situated to resolve novel and ambiguous distinctions between the SSA's regulatory and sub-regulatory directives. The Court does note, however, that distribution

and averaging are not functionally equivalent in every case. Suppose, for example, that a claimant earns wages of $950 per month. Her employer offers a merit-based incentive payment of $300 every six months, but she only qualifies for that payment in the first six months of the year. On these facts, distribution of her one-time incentive payment would require the agency to divide $300 by six, resulting in an additional $50 in monthly earnings, for a total of $1,000 per month in the first six months of the year. But averaging her income over the calendar year would only amount to $975 per month. In that case, distribution would push the claimant over the SGA threshold for six months, whereas annual averaging would keep her under the limit for the entire year.[3] And this distinction makes sense: because the claimant only earned the incentive payment during the first six months of the year, spreading those earnings across the remaining six months would be unreasonable. But if, by contrast, the employer offered an annual incentive payment that reflected her work over the entire twelve-month period, distribution and averaging would produce the same result. That outcome also makes sense: because the claimant earned the incentive payment during every month of the year, spreading her earnings across each month would be reasonable.

The Commissioner relatedly thinks distribution is "logical" here because Adkison's "incentive pay—unlike [her] wages—[was] not attributable only to the month in which it was paid." [R. 19 at 4.] Instead, she believes Adkison's incentive payments were "based on her work over the entire 12-month period." [*Id.*] But the record does not suggest that these payments reflected her work over the entire calendar year. Bushnell testified, for example, that

---

[3] Of course, in other cases averaging would have the opposite effect. Suppose, for example, that a claimant earned $950 per month and her employer offered a monthly merit-based incentive payment of $600. If the claimant only qualified for this payment in one month out of the year, distributing the payment would push her over the limit on only that month. But averaging the payment would require the SSA to divide $600 by twelve, resulting in an additional $50 per month, for a total of $1,000 per month.

9

Adkison was "not required to attend incentive training every month." [Tr. 126.] Adkison stated that she attended these events "usually twice a year," including "one in the spring and one in the fall." [Tr. 181.] And in its "Summary of [Adkison's] Training Hours and Units Completed" for the "County Elected Officials Training Incentive Program," the Department for Local Government indicates that Adkison attended training events on only three out of twelve months in 2011, including a fall conference in October, a spring conference in April, and a "Governor's Local Issues Conference" in August. [Tr. 116.]

The record thus indicates that (1) the county paid Adkison for attending specific training events in 2011 and (2) these events occurred on only three out of twelve months that year. Because POMS permits the SSA to distribute an incentive payment over the entire calendar year only "[i]f the amount [paid] does not represent a specific period of work activity, or a specific time period is not determinable," distributing Adkison's incentive payment over *every* month of 2011 was likely a mistake even if distribution was otherwise warranted. The Appeals Council recognized a similar problem when it stated "the earnings that were due to the trainings [she] attended should have been counted when [she] completed the trainings in question, not averaged over the entire year or counted when [she] received lump sum payments for those trainings." [Tr. 7.] Even accepting that distribution of Adkison's incentive payment was proper, then, the record does not support the Commissioner's related claim that these payments were "based on her work over the entire 12-month period." [*Id.*]

### III

Both the ALJ and the Appeals Council improperly averaged Adkison's income in 2011. They not only committed this error, but also failed to address two critical questions in this case. The first is whether § 404.1592a(a)(2)(i) prohibited the distribution of Adkison's incentive

10

payment during her entire EPE. If it did not, the second question is whether this payment reflected her work during every month of 2011, or whether it reflected only her attendance at training events during specific periods of the year. The Court thus finds that the ALJ's decision was not supported by substantial evidence. Remand is necessary to recalculate the impact of Adkison's May 2011 incentive payment on her entitlement to benefits from January 2011 onward. Accordingly, the Court **HEREBY ORDERS** as follows:

1. The Magistrate's Recommended Disposition **[R. 16]** is **ADOPTED IN PART**. The Court **ADOPTS** the Magistrate's finding that Adkison's mileage stipend and incentive payment counted as income, but **DECLINES TO ADOPT** the finding that Adkison's earnings were properly calculated during the months of 2011;

2. Adkison's Motion for Summary Judgment [**R. 12**] is **GRANTED**;

3. The Commissioner's Motion for Summary Judgment [**R. 13**] is **DENIED**;

4. This case is **REMANDED** for further proceedings; and

5. **JUDGMENT** reversing and remanding this matter will be entered contemporaneously herewith.

This 29th day of September, 2016.

Gregory F. Van Tatenhove
United States District Judge